**Marc HALPERN, Plaintiff,**

v.

**Robert W. ARMSTRONG, Jay I. Bennett, Irving J. Bottner, Jacob Burns, Benjamin J. Buttenweiser, Sol Levine, Aileen Mehle, Harry Meresman, Simon H. Rifkind, John H. Williford, Paul P. Woolard, Mark D. Soroko, Victor J. Barnett, Harry Meresman and Simon H. Rifkind as Executors of the Estate of Charles Revson, and Revlon, Inc., Defendants.**

**No. 77 CIV. 2781 (MP).**

United States District Court, S. D. New York.

May 28, 1980.

Garwin & Bronzaft, New York City, by Sidney L. Garwin, Bertram Bronzaft, Bruce E. Gerstein, New York City, for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, by Jay H. Topkis, M. Tracy Sillerman, New York City, for individual defendants.

Parker, Auspitz, Neesemann & Delehanty, New York City, by Jack C. Auspitz, New York City, for defendant Revlon.

## DECISION AND OPINION

MILTON POLLACK, District Judge.

This derivative action against Revlon, Inc. and its directors has been submitted for judgment as to liability on stipulated facts. Jurisdiction is posited on diversity and on questions arising under the federal securities laws.

In a stipulation entered into by the parties on April 9, 1979, and filed on June 22, 1979, it was agreed that "this action shall be adjudicated with the same force and effect as if a trial had been held on the issue of liability and the . . . agreed facts and exhibits constituted the evidence at said trial." The parties, having determined that the issue of liability in this case could be decided on stipulated facts, thereby waived their right to present live testimony and removed such attendant issues as witness credibility from the purview of this Court.

This action concerns the administration of Revlon's Executive Stock Option Plan (hereinafter "the plan"), which was adopted by the stockholders in 1957, and, as detailed below, amended from time to time thereafter. In particular, the case arises out of the cancellation in June 1974 of outstanding stock options held by certain Revlon employees and the issuance in exchange of a like number of new options at a lower price to replace the cancelled options. This cancellation and exchange program was conducted by Revlon's Stock Option Committee pursuant to the authorization it had been given in May 1974 by the Board of Directors, which had at the same time in May adopted resolutions amending the plan in certain ways to accommodate the cancellation and exchange. Neither the cancellation and exchange nor the amendments to the plan in respect thereof were submitted to a vote by the stockholders.

Plaintiff asserts that the May 1974 amendments were null and void because the Board's power to unilaterally amend the plan—which admittedly it had to begin with—had lapsed prior to that time. Plaintiff's argument is as follows: as adopted in 1957, the plan gave the Board power to modify the plan at any time up until June 1, 1967 (the original termination date of the plan); the Board subsequently adopted resolutions extending its power of modification to June 30, 1973; however, neither the Board nor the stockholders adopted any resolution prior to June 30, 1973 expressing an extension of the Board's power of modification beyond that date; as a result, the Board's power to modify the plan lapsed on June 30, 1973, and all power of modification reverted to the stockholders. Hence, the May 1974 amendments, which were not voted on by the stockholders, are claimed to have been a nullity.

Plaintiff asserts further that without the May 1974 amendments, the plan did not countenance the cancellation and exchange of options, which, according to plaintiff, is simply a device for lowering the price of outstanding options. Plaintiff claims that the Board thus exceeded its power in conducting the cancellation and exchange in violation of the plan, and, moreover, also exceeded the maximum number of shares that could be issued under the plan.

Plaintiff also attacks the cancellation and exchange on the ground that the Board of Directors expressly stated in proxy statements issued in 1961 and 1963 that it would not effect a price reduction in stock options through a cancellation and exchange without obtaining shareholder approval. This representation was allegedly binding on the Board in 1974 and prohibited it from conducting the cancellation and exchange without shareholder approval. In addition, plaintiff claims that the Board made similar representations in listing applications filed with the New York Stock Exchange ("N.Y. S.E.") in 1961 and 1963, and that when the Board conducted the cancellation and exchange in 1974, it violated this "agreement" with the N.Y.S.E. and also violated the rules of the N.Y.S.E.

Finally, plaintiff claims that the proxy statements issued by Revlon in 1973, 1974, and 1975 violated § 14(a) of the Securities Exchange Act of 1934 by being materially false and misleading with respect to those portions dealing with the stock option plan.

For the reasons discussed hereafter, the 1974 addition to the pool of options by reason of cancellations of unexercised options under the "exchange" program will not be given effect and the validity of grants of options in 1974 and thereafter will be upheld only to the extent that shares were otherwise available for option. Liability will be adjudged to the extent that grants resulted in the issuance of options under the plan beyond the maximum number of options authorized by the plan and to the extent that any employee was granted options on more shares than would have been permissible under the plan without the cancellations.

### Adoption of the plan

The Executive Stock Option Plan was adopted by the Board of Directors on January 23, 1957, subject to the approval of the stockholders. The 1957 proxy statement recommended that the stockholders approve the plan because

It is now generally recognized that stock option plans constitute an effective method of attracting and retaining valued management personnel . . . In the opinion of the Board of Directors, this [plan] will strengthen the desire of such personnel to remain as employees and stimulate their efforts on the Company's behalf, which should contribute to the Company's future welfare and success.

The plan, a full copy of which was appended to the proxy statement, was duly approved by a majority of the shareholders at their annual meeting.

As originally adopted, the plan provided, *inter alia*, that it was to be administered by a Stock Option Committee consisting of three or more directors, excluding directors who were eligible to participate in the plan; the term of all options granted was to be seven years or less; options were to be exercisable not earlier than 18 months from their issuance, after which the optionee could exercise annually up to 20% of the shares to which the option related; the option price was to be at least 95% of the market price of the stock on the day the option was granted.

The total number of shares originally available under the plan was 140,000, the optioned stock to consist of either unissued or re-acquired (treasury) stock. No employee was eligible to receive options to purchase more than 10,000 shares. The plan was to terminate on June 30, 1967, but the Board of Directors was given power to modify or terminate the plan at any time prior to June 30, 1967.

### Amendments of the plan 1959–1963

Notwithstanding the power given the Board to modify the plan, Revlon's Board of Directors developed a practice of submit-

ting most amendments to the plan to the stockholders for approval. In 1959, for example, the Board adopted, subject to shareholder approval, a resolution that the plan

be and hereby is amended by changing paragraphs 2 and 5 thereof to read as follows:

2. AMOUNT OF STOCK

The total number of shares . . . shall not exceed 200,000 . . .

5. EXPIRATION AND TERMINATION OF THE PLAN

Options may be granted under the Plan at any time . . . prior to June 30, 1969, on which date the Plan will expire. Such options shall remain in effect until they have been exercised or have expired. The Plan may be terminated or modified at any time prior to June 30, 1959 by the Board of Directors.

Pursuant to this Board resolution, the 1959 proxy statement submitted for shareholder consideration "a proposal to increase the number of shares of the Company's Common Stock subject to the Plan from 140,000 to 200,000 shares, and to extend its expiration date from June 30, 1967 to June 30, 1969." The proxy statement did not, however, fully set forth the plan or even paragraphs 2 and 5 as amended, and thus, did not state or suggest that the proposal involved the Board's power to modify the plan, or that adoption of the proposal would extend the Board's power of modification to June 30, 1969.[1] Nonetheless, the submitted proposal was duly approved by the share-

holders, as recommended by the proxy statement.

Virtually this same series of events was replayed in 1961, when the plan was amended to increase the number of available shares to 600,000 [2], and to extend the plan's expiration date to June 30, 1971; and again in 1963, when the plan was amended to increase the number of available shares to 806,000 and to extend the expiration date to June 30, 1973. In each of these years, the Board adopted a resolution setting forth the pertinent paragraphs of the plan as amended, and in each case the Board's power of modification was extended in paragraph 5 to be coterminous with the new expiration date of the plan. The proxy statements in each of these years, however, did not fully set forth the amended paragraphs, but simply presented the shareholders with proposals "to increase the number of shares . . subject to the plan . . . and to extend its expiration date." No mention was made in the proxy statements that the Board's power to modify the plan had been or would be similarly extended.

In addition, both the 1961 and 1963 proxy statements contained the following statement:

Unless submitted to stockholders for their approval, no adjustments or reduction of the exercise price of any option shall be made, in the event of a decline in the market price, such as by cancellation of outstanding options and subsequent regranting of options at a lower price.

---

1. The Board's power of modification was referred to by implication in the proxy statement, wherein it was stated:

"While the proposal to amend the Plan does not, under the Company's Certificate of Incorporation or By-Laws, require the approval of the holders of the . . . Common Stock of the Company, nevertheless the Board of Directors believes that the Plan should be submitted for stockholders' action. The amendment will not be put into effect unless a majority of the total Common . . . shares entitled to vote thereon approve the same." A statement to this effect also appeared in the proxy statements issued in 1961, 1963, 1965, 1966 and 1968. However, in the post-1968 proxy statements, no statement was made that

shareholder approval of the proposed amendments was not required; rather, it was merely stated that "The amendments will not be put into effect unless a majority of the total shares entitled to vote thereon approve the same."

2. A stock split was announced by Revlon in 1961, so the nominal 400,000-share increase in the plan (200,000 to 600,000) represented a real increase of only 100,000 shares (200,000 to 300,000). Similarly, in 1963, there was a 1% stock dividend, making the total shares available under the plan 606,000. The maximum number of shares available to any one employee under the plan was likewise adjusted in each of these instances.

This statement also appeared on listing applications submitted by Revlon to the New York Stock Exchange in 1961 and 1963.[3]

In both years, the proposed amendments were approved by the stockholders.

*Conversion of the plan to a "qualified" plan*

The Board of Directors deviated somewhat from its practice of submitting proposed amendments of the plan to the stockholders in 1964, when it unilaterally adopted amendments designed to convert the plan from a "restricted" plan to a "qualified" plan under § 422 of the Internal Revenue Code. Under these amendments, the term of options became five years or less; the option price became 100% of the market price of the stock on the day of the grant; and, most importantly, no option could be exercised while any option previously granted at a higher price was outstanding. The provision that no option could be exercised until at least 18 months after issuance was continued as before.

Although, as mentioned, the amendments made in converting the plan from a restricted to a qualified plan were not submitted to the shareholders, they were fully disclosed in the 1965 proxy statement, when shareholder approval of an amendment was sought and obtained permitting the Stock Option Committee to grant options at less than 100% of market value to executives of companies acquired in mergers. The 1965 proxy statement did not repeat the statement contained in the 1961 and 1963 proxy statements viz., that unless submitted to the stockholders for their approval, no adjustments or reduction of the exercise price shall be made, in the event of a decline in the market price, such as by cancellation of outstanding options and subsequent regranting of options at a lower price; nor did any of the proxy statements issued subsequent to 1965 contain such a statement.

*Amendments of the plan 1966–1971*

In 1966, the Board of Directors adopted a resolution, subject to shareholder approval, that the plan

> be and . . . hereby is amended by changing Paragraph 2 to increase the number of shares of stock subject thereto from 814,060 to 1,014,060 . . . and by providing in Paragraph 5 thereof that the date on which the Plan will expire is February 1, 1974 instead of February 1, 1973.[4]

The 1966 resolution, unlike the earlier Board resolutions, did not set forth the paragraphs as amended, and did not state that the Board's power of modification was being extended. Nor did the 1966 proxy statement contain any statement that the proposed amendments also involved any extension of the Board's power to modify the plan.

Similarly, the shares available under the plan were again increased and the plan's expiration date again extended in 1968, 1970 and 1971.[5] As in 1966, however, neither the Board resolutions nor the proxy statements in any of these years made any mention of an extension of the Board's power of modification, or even referred to the existence of such a power.

*Shareholder-approved amendments 1973–1974*

At a meeting held on February 28, 1973, the Board resolved that the plan

---

3. As is discussed *infra at n. 21*, Revlon was required by the N.Y.S.E. to make this "undertaking" not to decrease option prices through cancellation and regrant because of possibilities of abuse present in "restricted" stock option plans. These possibilities of abuse disappeared when Revlon converted the plan to a "qualified" plan in 1964.

4. Apparently the Board was under a misapprehension that the plan's expiration date was February 1, 1973 rather than June 30, 1973. The authorized shares had been increased from 806,060 to 814,060 due to a 1% stock dividend.

5. In 1968, the available shares were increased from 1,014,060 to 1,164,060, and the expiration date was extended from February 1, 1974 to February 1, 1976. In 1969, Revlon declared a three-for-two stock split, so the available shares rose to 1,746,090. In 1970, this figure was increased by the stockholders to 2,121,090, and the expiration date was extended to February 1, 1978. In 1971, the available shares were again increased to 2,421,090 and the expiration date extended to February 1, 1980.

be amended, subject to approval of the stockholders at the next Annual Meeting . . . by increasing the number of shares subject to the Plan by 300,000 shares and the maximum number of shares which may be granted to any one person from 45,000 shares to 70,000 shares,[6] and by extending the term of the plan to February 1, 1982.

Again, the resolution did not mention any power in the Board to modify the plan, and the minutes of the February 28, 1973 meeting in fact state that, "The Chairman pointed out that the amendment of the Plan would require stockholder approval." The Board had previously taken the position that it was not strictly required to submit proposed amendments of the plan to the stockholders for approval, but rather that it was advisable to do so as a matter of "good corporate practice."

Pursuant to the Board resolution, the 1973 proxy statement submitted the proposed amendments to the stockholders, and sought their approval by stating,

> The Company's experience under the Plan during the past 16 years has convinced management of the important role of stock options in securing and retaining the services of outstanding personnel and enhancing their incentive to attain increased profits for the Company. The Board of Directors recommends that the Plan be extended and shares available for grant be replenished so that grants of options can continue to be made for these purposes . . .

The 1973 proxy statement also stated, as had all previous proxy statements, that the amendments would not be put into effect without shareholder approval. The proposed amendments were duly approved by the stockholders.

Amendments to the plan were again adopted in 1974, through precisely the same

process as had been followed in 1973. At a meeting held on March 27, 1974, the Board, having been informed by the Chairman that "amendment of the Plan would require stockholder approval," resolved that the plan "be amended, subject to approval of the stockholders . . . by increasing the number of shares subject to the plan by 200,000 shares and by extending the term of the plan from February 1, 1982 to February 1, 1984." The 1974 proxy statement again presented these amendments for shareholder consideration, and again recommended "that the Plan be extended and the shares available for grant be replenished so that grants of options can continue to be made." The amendments were again duly approved by the shareholders at their annual meeting, held on May 2, 1974. Again, neither the Board resolution nor the proxy statement mention any power in the board to modify the plan.

### The May 22, 1974 Board meeting and amendments to the plan

By 1974, the market price of Revlon stock had fallen below the price at which many of the outstanding options could be exercised, endangering the effectiveness of the plan as an incentive.[7] On May 22, 1974, therefore, the Board held a meeting and passed a resolution authorizing the Stock Option Committee

> to offer to all employees of the Company and its affiliates who presently hold unexpired options under the Executive Stock Option Plan of the Company the opportunity to exchange such unexpired options for new five-year options at current market prices, covering the same number of shares as such unexpired options . . .

As of January 1, 1974, unexpired options covering 830,447 shares of Revlon stock were outstanding under the plan, so the

---

6. The per-employee maximum had risen through stock splits and dividends from its original 10,000 figure to 20,402 in 1965. In 1966, the stockholders approved an increase in the maximum to 30,000 shares, and this rose to 45,000 in 1969 as a result of a three-for-two stock split.

7. On May 22, 1974, Revlon Common Stock closed at $53. The average exercise price of outstanding options was approximately $70.

effect of the May 22 resolution, if employees turned in their unexpired options, might have been to increase the pool of stock that could be optioned out by some 800,000 shares. However, under the terms of the plan, options on such additional shares would not be exercisable until the options turned in for cancellation would have expired, and not in any event for 18 months.

In conjunction with the resolution authorizing the Stock Option Committee to conduct this exchange, the Board also passed a resolution making "certain clarifying amendments to the Plan", which had the effect of modifying the plan to accommodate the proposed cancellation and exchange. Thus, the sentence in paragraph 2 ("Amount of Stock") which had read, "The total number of shares of Common Stock to be subject to options granted pursuant to the Plan shall not exceed [2,921,090] shares," was amended to authorize the reoptioning of shares covered by "terminated options" (a phrase that did not appear in the original plan), by providing

the total number of shares of Common Stock subject at any one time to options granted under the Plan plus the number of such shares then outstanding pursuant to exercises of options granted under the Plan shall not exceed 2,921,090. If, and to the extent that, options granted under the Plan terminate without having been exercised, new options may be granted with respect to the. shares covered by such terminated or expired options;

Similarly, paragraph 5 which had read, "Such options shall remain in effect until they have been exercised or have expired," was amended to read, "[S]uch options shall remain in effect until they have been exercised or terminated or have expired." Paragraph 3 of the plan was also amended to expand the discretion of the Stock Option Committee by providing:

The Committee is authorized to interpret and construe the provisions of the Plan and may adopt such rules and regulations for administering the Plan as it may deem necessary. Decisions of the Com-

mittee shall be final and binding on all parties who have an interest in the Plan.

In addition, the sentence in paragraph 5 which had originally given unlimited power to the Board of Directors to terminate or modify the Plan (albeit only up until June 30, 1967, and thereafter June 30, 1973) was amended to read:

The Plan may be terminated, modified or amended at any time prior to February 1, 1984 by the Board of Directors, except with respect to any options then outstanding under the Plan, provided, however that no termination, modification or amendment shall be made which shall (a) increase the total number of shares that may be made subject to options as provided in Section 2 of the Plan, (b) increase the maximum number of shares that may be made subject to options granted to any one officer or key employee as provided in Section 4 of the Plan, (c) decrease the minimum option price provided for in Section 5 of the Plan, unless such termination, modification or amendment is made with the approval of the stockholders of the Company, which approval may be given retroactively.

These "clarifying amendments" were not submitted to the stockholders for their approval. However, at the May 22, 1974 meeting the Board also adopted one amendment that was submitted to the stockholders; it provided "that the present 70,000 share limitation on options which may be granted to any one person shall not include terminated or expired options." As to this amendment, the Chairman informed the Board that stockholder approval would be required, so this amendment was adopted subject to stockholder approval.

A full copy of the plan as amended was appended to the minutes of the Board meeting.

*The cancellation and exchange*

Pursuant to the authority given it by the May 22 Board resolution, the Stock Option Committee on May 28, 1974 sent a letter to all optionees stating that it had

decided that all employees who were granted options during the five-year period prior to the date of this letter . . will be given the opportunity to exchange them, to the extent they remain unexercised, for new options . . . which will have an exercise price equal to the market price for Revlon Stock on the New York Stock Exchange on the date the New Options are granted.

On June 28, 1974, the Stock Option Committee accepted the surrender for cancellation of outstanding options covering 439,474 shares, and issued new options to the same holders in the same amounts. The new options were exercisable at a price of $56.75, whereas the cancelled options had an average exercise price of around $70. Directors of Revlon were recipients of options on 124,354 shares in this transaction.

*The 1975 proxy statement*

In a proxy statement dated April 10, 1975, Revlon's stockholders were asked to consider and act upon "a proposal to amend the . . . Plan to provide that the existing 70,000 share limitation on options which may be granted to any one officer or key employee shall not include terminated or expired options to the extent that such options have not been exercised." The proxy statement recommended—and successfully obtained—shareholder approval on the ground that

It has been shown . . . that these objectives [i. e., retaining personnel, enhancing incentive] may sometimes be thwarted to the extent that all of the shares originally subject to an option are counted in determining the maximum share limitation even though part or all of that option may be terminated or may expire in accordance with its terms without having been exercised.

The 1975 proxy statement did not submit any of the other May 22 Board amendments for shareholder approval, but noted that "other amendments of the Plan, designed to clarify its terms, have been approved by the Board of Directors, but such amendments do not require stockholder approval."[8] The following information also appeared in a section entitled "Information Concerning Stock Options":

During the period from January 1, 1970 to March 1, 1974 options to acquire a total of 346,552 shares of the Company's Common Stock were granted to all directors and officers as a group at an average price per share of $54.686 (based on the closing market prices on the New York Stock Exchange on the dates of grant), not including options granted during that period to the extent that such options were cancelled.

\* \* \* \* \* \*

During the same period options to acquire a total of 1,215,305 shares of Common Stock were granted to all employees at an average price per share of $59.332 (based on such closing market prices), not including options granted during such period to the extent cancelled.

During the same period options to acquire a total of 113,204 shares of Common

---

8. *In describing the terms of the plan, the statement said, "The Plan, which was first approved by the stockholders on April 10, 1957 and amended by stockholder action from time to time thereafter, provided prior to the proposed amendment that (a) its term expires on February 1, 1984, (b) the total number of shares . . subject at any one time to options, plus the number of shares . . . then outstanding pursuant to exercises of options, may not exceed 2,921,090 . . ." In fact, however, as noted above, the manner of calculating the total number of shares set forth in term "(b)"* was not (as the proxy statement suggests) approved by the shareholders, but rather was instituted unilaterally by the Board in one of its May 22, 1974 amendments. Prior to that, the plan had merely provided that, "The total number of shares . . . to be subject to options granted pursuant to the Plan shall not exceed [2,921,090] shares." The difference between the two formulations is that under the provision as amended, shares covered by cancelled options could be added back to the pool of stock available for option purposes. *See* n. 18, *infra.*

Stock at an average price per share of $68.925 (based on such closing market prices) were granted to all directors and officers as a group, but such options were cancelled in exchange for new options covering the same number of shares granted on June 28, 1974 at a price per share of $56.75 (the closing market price on the New York Stock Exchange on such date). Such new options are included in the preceding paragraph.

\* \* \* \* \* \*

All employees cancelled options granted during the same period covering a total of 304,834 shares of Common Stock at an average option price per share of $70.14 (based on such closing market prices) in exchange for new options covering the same number of shares granted on June 28, 1974 at a price per share of $56.75 (the closing market price on the New York Stock Exchange on such date), which new options are similarly included in the preceding paragraph.

It should be noted that because the proxy statement used a five-year reporting period, it stated that options granted during that period covering 304,834 shares of stock had been cancelled, and did not state that in fact a total of 439,474 shares had been cancelled. However, the 1974 Annual Report, which accompanied the 1975 proxy statement, stated in a section entitled "Stock Option and Stock Purchase Plans", "[O]ptions covering 439,474 shares granted in 1974 were granted after cancellation of the same number of previously granted options."

*Grants of options to date*

As of January 1, 1973, Revlon's Stock Option Committee had available for use in the plan 204,552 shares of stock, and during the course of the year, 59,490 shares became available through the expiration of options due to the optionee's termination of employment or failure to exercise prior to the option's expiration date.[9] In addition, at the annual meeting held on May 3, 1973, the shareholders approved an increase of 300,-000 shares, making a total available pool of 564,042 shares.

During 1973, options covering 203,620 shares were granted, so that as of January 1, 1974, there would have been, by these calculations, 360,422 shares of available stock for option purposes. During 1974, 118,900 shares became available due to expiration of options, and at the annual meeting held on May 2 of that year, the shareholders approved an additional 200,000 shares. No shareholder-approved additions to the pool of available stock were made after May 2, 1974. However, as heretofore described, on June 28, 1974, options covering 439,474 shares were cancelled, which created, by Revlon's calculation, an available pool of 1,118,796 shares of stock for option purposes.

During 1974, options (including those issued pursuant to the cancellation and exchange) covering 640,352 shares were granted, so that by Revlon's figures there were available for use in the plan 478,444 shares of stock as of January 1, 1975. If we make the appropriate adjustments to this figure for additions to and subtractions from the pool in 1975, 1976 and 1977 (as has been done in the margin), there would have been

---

9. Plaintiff contends that Revlon's policy, which it followed from the inception of the plan, of returning shares covered by expired (as opposed to cancelled) options to the available pool of stock also violated the terms of the plan. There is no merit to this claim. The plan provided that the stock used under the plan was to consist of "unissued or re-acquired shares (treasury stock)". Shares covered by options that expired in accordance with the terms of the plan were never "issued" and thus could validly be made subject to newly issued options, especially in light of Revlon's disclosure of its policy of re-using these shares in the annual reports that accompanied its proxy statements. The difference between re-issuing shares covered by "expired" options and re-issuing shares covered by cancelled options is that the plan provided for the expiration of options, but did not (as discussed *infra*) provide for the cancellation of options.

available for use in the plan as of January 1, 1978, 864,683 shares of stock.[10]

Plaintiff contends, however, that since the cancellation and exchange were conducted in violation of the plan and the shareholders' rights, the 439,474 shares regained by the June 28 cancellation cannot properly be considered to be part of the pool. Subtracting these shares, Revlon would have had available as of January 1, 1975 only 38,970 shares of stock for option uses. If we make the appropriate adjustments to this figure for additions to and subtractions from the pool in 1975, 1976 and 1977 (as has again been done in the margin), as of January 1, 1978, there would be an overgrant of options to the extent of 14,265 shares.[11]

Plaintiff, however, contends that this figure understates the actual overgrant of options, because it assumes the validity of the shareholder-approved increased in 1973 and 1974. Plaintiff argues that the 1973 and 1974 proxy statements were false and misleading with respect to information about stock options, and thus that the shareholder-approved increases were null and void. This would reduce the available pool of stock by some 500,000 shares, and swell the

overgrant to approximately 520,000 shares.[12] Plaintiff claims that defendants are liable to the corporation for damages caused it by this alleged overgrant.

## DISCUSSION

### Preliminary

We start from the fact that involved herein is a plan conferring benefits upon employees as an incentive to service, one in which the corporate body has a vital, irreproachable interest unless abused in service of the self-interest of the plan's administrators or the recipients of its benefits. Stock option plans have been widely accepted as an effective means of re-invigorating executives whose profit-seeking zeal has been sapped by high personal tax rates. From the employee's perspective, options have the advantage of allowing income to be deferred, with the gain ultimately realized taxed as capital gains. From the corporation's standpoint, stock option plans may generate greater returns than simple pay increases by encouraging management to secure a proprietary interest in the corporation, and by tying executive compensation to corporate earnings and stock market performance. Moreover, by conditioning the

**10.** By Revlon's calculations, the figures on available stock are as follows:

| Year | Shares Available at beginning of Year | Shareholder Approved additions | Stock Splits | Cancelled or Expired Options | Total | Granted |
|---|---|---|---|---|---|---|
| 1974 | 360,422 | 200,000 | | 558,374 | 1,118,796 | 640,352 |
| 1975 | 478,444 | | | 56,410 | 534,854 | 88,669 |
| 1976 | 446,185 | | 446,185 | 290,284 | 1,182,654 | 282,050 |
| 1977 | 900,604 | | | 124,708 | 1,025,312 | 160,629 |
| 1978 | 864,683 | | | | | |

In May 1978, Revlon's shareholders authorized an entirely new grant of 1,500,000 shares for a different non-qualified stock option plan. Consequently, Revlon granted no qualified options under the plan here in issue after 1977.

**11.** The overgrant of 14,265 is arrived at by the following calculations:

| Year | Shares Available at beginning of Year | Shareholder Approved Additions | Stock Splits | Expired Options | Total | Granted |
|---|---|---|---|---|---|---|
| 1974 | 360,422 | 200,000 | | 118,900 | 679,322 | 640,352 |
| 1975 | 38,970 | | | 56,410 | 95,380 | 88,669 |
| 1976 | 6,711 | | 6,711 | 290,284 | 303,706 | 282,050 |
| 1977 | 21,656 | | | 124,708 | 146,364 | 160,629 |
| 1978 | (14,265) | | | | | |

**12.** The actual figure would be 520,976. This *exceeds the overgrant of 14,265 by more than* 500,000 shares because under this scenario, in 1976 there would not have been 6,711 shares available at the time of the stock split.

employee's right to exercise options on continued service to the corporation, stock option plans may help retain desired key personnel. *See generally, Freedman v. Barrow,* 427 F.Supp. 1129, 1136–1138 (S.D.N.Y. 1976).

*The exchange of higher for lower cost options violated the plan*

The creation and administration of stock option plans by corporations chartered in Delaware—as Revlon is—are governed by 8 Del.Code Ann. § 157, which provides:

> Subject to any provisions in the certificate of incorporation, every corporation may create and issue, whether or not in connection with the issue and sale of any shares of stock or other securities of the corporation, rights or options entitling the holders thereof to purchase from the corporation any shares of its capital stock of any class or classes, such rights or options to be evidenced by or in such instrument or instruments as shall be approved by the board of directors.
>
> *The terms* upon which, including the time or times which may be limited or unlimited in duration, at or within which, and the price or prices at which any such shares may be purchased from the corporation upon the exercise of any such right or option, *shall be such as shall be stated* in the certificate of incorporation, or *in a resolution adopted by the board* of directors providing for the creation and issue of such rights or options, and, in every case, shall be set forth or incorporated by reference in the instrument or instruments evidencing such rights or options. In the absence of actual fraud in the transaction, the *judgment of the directors* as to the consideration for the issuance of such rights or options and the sufficiency thereof shall be *conclusive.* [Emphasis supplied.]

■ Defendants claim that this statute, which authorizes the Board of Directors in the first instance to provide for the creation

and issuance of capital stock options and in their conclusive judgment to set the consideration to be paid therefor, must be held also to authorize the Board to amend option plans without shareholder approval. Case law, however, establishes that the Board's statutory power to administer a stock option plan may be limited by the Board's own resolutions and by the terms of the plan itself. *See, Michelson v. Duncan,* 407 A.2d 211 (Del.1979); [13] *Waltzer v. Billera,* CCH Fed.Sec.L.Rep. ¶ 94,011 (S.D.N.Y.1973)

Thus the question in this case is whether the Board's statutory authority to act on the plan was limited by the terms of the plan or by the Board's own resolutions and representations on which the shareholders were entitled to rely.

Plaintiff contends in part herein that the Board's power to amend the plan lapsed in 1973. There is little doubt in this regard that the Board must have intended to extend its power of modification each time it extended the expiration date of the plan, and that the omission to do so in the usual resolution adopted could be viewed as a technicality. Indeed, if the plan had originally provided, "The Plan may be terminated or modified at any time prior to the Plan's expiration date by the Board," instead of "prior to June 30, 1967," there would be little left of this aspect of plaintiff's claim.

In the absence of any evidence of predatory intent on the Board's part, this Court is reluctant to overturn the Board's considered actions on the basis of such a technical if not hypertechnical argument. Of more import to this Court are the plain statements that the Board made to the stockholders in each of the proxy statements seeking stockholder approval of proposed amendments to the plan. In none of the proxy statements after 1968 was there any intimation that the Board was possessed of a power to amend the plan unilaterally, although disclosure of such a power would be required under Item 9(e), Sched-

---

13. In *Michelson, supra,* the Delaware Supreme Court held that a cancellation and exchange of stock options similar to the one challenged herein had been conducted in violation of the terms of the stock option plan as adopted, and that the cancellation and exchange was therefore voidable. The court held further, however, that any problem with the board's acts had been cured by subsequent shareholder ratification.

ule 14A, 17 C.F.R. § 240.14a–101.[14] Rather, each proxy statement said, "The amendments will not be put into effect unless a majority of the shares entitled to vote thereon approve the same." Even the 1968 proxy statement, which was the last one to articulate the power in the Board to make amendments, assured stockholders that no significant actions would be taken with respect to the plan without their affirmative assent, by stating:

> While the proposals to amend the Plan do not, under the Company's Certificate of Incorporation or By-Laws, require the approval of the stockholders, nevertheless the Board of Directors believes the plan should be submitted for stockholder action. The amendments will not be put into effect unless a majority of the total shares entitled to vote thereon approve the same.

■ Defendants, having chosen to circumscribe their statutory powers over the plan and having so announced to all and sundry, were not entitled to act in disregard of these representations to the public and shareholders, and thus were obliged to submit any amendments they wished to make to the plan for shareholder approval. The amendments adopted by the Board on May 22, 1974, having never been submitted for or received shareholder approval, were not effective.

As the plan stood prior to the May 22, 1974 amendments, it provided that "[O]ptions shall remain in effect until they have been exercised or expired." The only manner in which an option expired was by termination of employment or failure to exercise an option within its lifespan. The plan clearly did not contemplate or authorize an exchange of higher priced for lower priced options of the sort authorized by Revlon's Board herein.[15]

■ Since the May 22, 1974 Board amendments were not within the confines of the plan and thus of no effect, and since the exchange of higher priced for lower priced options was in violation of the plan as it stood without those amendments and as announced to the public, Revlon's Board was not entitled to authorize adding back to the pool of stock available for option purposes the 439,474 shares of stock covered by cancelled options. To the extent that options granted thereafter exceeded the stock available therefor in the authorized pool, there has been a voidable overgrant. This overgrant seems to have amounted to at least 14,265 shares, but if there be merit in any of plaintiff's proxy claims, the available pool of stock would be reduced *pro tanto.*

*Plaintiff's proxy claims concerning the 1975 proxy statement*

Plaintiff claims that the 1973, 1974 and 1975 proxy statements violated § 14(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78n(a)) and various rules adopted by the S.E.C. pursuant to that section. The significance of these alleged violations of the proxy rules is that the stockholders at the 1973 and 1974 annual meetings authorized increases in the pool of stock available for stock option grants, and at the 1975 meeting approved a Board amendment ex-

---

**14.** Item 9(e) of Schedule 14A provides, "If the plan to be acted upon can be amended otherwise than by a vote of stockholders, to increase the cost thereof to the issuer or to alter the allocation of the benefits as between the groups specified in (b) [directors, officers, and employees], state the nature of the amendments which can be so made."

**15.** In fact, as the plan stood prior to the May 22 amendments, it was even more restrictive than the one in issue in *Michelson v. Duncan, supra,* where the court found that a provision authorizing the re-optioning of shares covered by "expired" options did not authorize a cancellation and exchange similar to the one conducted

by Revlon's Board. Defendants' reliance on *Waltzer v. Billera, supra, Jacoby v. Averell,* CCH Fed.Sec.L.Rep. ¶ 94,350 (S.D.N.Y.1974), and *Cohen v. Ayers,* 596 F.2d 733 (7th Cir. 1979) as authorizing the cancellation and exchange procedure employed by Revlon's Board is misplaced. In each of those cases, the stock option plan in question authorized the re-optioning of shares covered by "terminated" (as opposed to "expired") options, much as Revlon's plan would have if the May 22, 1974 Board amendments had been validly implemented. In each case, as in this, the question was whether the terms of the plan authorized a cancellation and exchange.

cluding "terminated" shares from the calculation of the 70,000 share limit on options that could be granted to any one employee. A violation of the rules could have the consequence of voiding the actions taken at the respective annual meeting.

■ In particular, plaintiff contends that the proxy statements violated Rule 14a–9 (17 C.F.R. § 240.14a–9), which provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . .

To establish a cause of action for a violation of Rule 14a–9, "plaintiff must demonstrate: (1) that the proxy materials contain a false or misleading statement of a material fact or omit to state a material fact necessary in order to make the statement made not false or misleading; (2) that the misstatement or omission of a material fact was the result of knowing, reckless or negligent conduct; and (3) that the proxy solicitation was an essential link in effecting the proposed corporate action." *Berkman v. Rust Craft Greeting Cards*, 454 F.Supp. 787, 791 (S.D. N.Y.1978).

The only proxy claim that plaintiff asserts that has any semblance of merit concerns the 1975 proxy statement, which sought and obtained shareholder approval of the May 22 Board amendment excluding "terminated" shares from the 70,000 share limit on options that could be granted to any one employee. Without shareholder

approval of this amendment, the options received by defendants Woolard and Barnett pursuant to the cancellation and exchange would have exceeded this 70,000 share maximum.[16] Plaintiff contends that the statement made in the 1975 proxy statement that "Certain other amendments of the Plan, designed to clarify its terms, have been approved by the Board of Directors, but such amendments do not require stockholder approval," was materially false and misleading, and vitiated the shareholder approval of the submitted proposal.

Plaintiff is correct that the May 22, 1974 amendments cannot fairly be termed mere clarifications. The May 22 amendments were designed not merely to clarify the plan but to modify it so as to permit a cancellation and exchange, which would not have been authorized under the plan prior to the amendments. There is assuredly a substantive difference between a plan under which outstanding options can be cancelled and the shares previously covered by those options used for the issuance of new options, and a plan under which no such cancellation and exchange is possible; the magnitude of this difference is demonstrated by the fact that the May 22 amendments had the effect of making some 800,000 shares covered by outstanding options potentially available for re-option.

■ Thus, the statement in the 1975 proxy statement that the May 22 amendments would merely "clarify" the plan was materially misleading. A shareholder deciding whether "terminated" options should be included in calculating the 70,000 shares-per-employee limit[17] would certainly want to know that the question could never have arisen without the Board's adoption of

---

**16.** It is entirely possible that without implementation of the submitted amendment, other officers would have by now been granted options covering more than the permitted 70,000 share maximum. However, there is nothing in the record to indicate which, if any, officers this might be true of, or by how many shares they would have exceeded the 70,000 share limit.

**17.** The proxy statement did not even state that "terminated" options included cancelled ones,

as the statement did in *Cohen v. Ayers, supra*, a case on which defendants rely heavily. Rather Revlon's 1975 proxy statement said the plan's objectives may "be thwarted to the extent that all of the shares originally subject to an option are counted in determining the maximum share limitation even though part or all of that option may be terminated or may expire in accordance with its terms without having been exercised."

these other "clarifying" amendments. The shareholders might rightfully have viewed the proposal with more suspicion had they known—or even been able to ascertain—that these "clarifying" amendments were adopted by the Board in order to permit the Stock Option Committee to conduct a cancellation and exchange of higher priced for lower priced options that would substantially benefit a number of the corporation's directors.[18]

■ The misleading nature of the 1975 proxy statement was certainly the result of at least negligent conduct on the part of defendants. Given that the "clarifying" amendments were passed almost simultaneously with a resolution authorizing the Stock Option Committee to conduct the cancellation and exchange, the Board can hardly have been without knowledge of the purpose and effect of the amendments, particularly since seven of the 13 directors ultimately benefitted from the cancellation and exchange. While the evidence does not show that the proxy statement was drawn up with the intent to deceive stockholders, this need not be shown in a § 14(a) action. *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1299–1300 (2d Cir. 1973).

It should be emphasized that the Board's failure was not simply that it did not reveal that the May 22 amendments and the cancellation and exchange violated the terms of the plan. This would not in itself constitute a violation of § 14(a). *See, e. g., Waltzer v. Billera*, CCH Fed.Sec.L.Rep. ¶ 94,011

(S.D.N.Y.1973). Rather it is the non-disclosure of the nature and purpose of the May 22 amendments that runs afoul of the disclosure requirements, and this would be so even if the amendments had been authorized under the plan. What was required of the Board was not revelation of the legal status of its acts, but rather a frank and adequate description of their nature, particularly since a majority of the Board stood to benefit from cancellation and exchange.

Since the 1975 proxy statement did not adequately disclose the nature and purpose of the amendments to the plan adopted by the Board on May 22, 1974, no effect can be given to the shareholder approval of the submitted proposal. *See Dillon v. Berg*, 326 F.Supp. 1214, 1216, 1235 (D.Del.), *aff'd*, 453 F.2d 876 (3d Cir. 1971). Consequently, to the extent that any officer has been granted options covering shares in excess of the 70,000 share maximum, as calculated prior to the amendments, the transactions stemming therefrom should be undone.

*Plaintiff's proxy claims concerning the 1973 and 1974 proxy statements*

■ Plaintiff's claims that the 1973 and 1974 proxy statements were materially false or misleading in violation of § 14(a) of the Securities Exchange Act of 1934 can be quickly disposed of. The primary attack that plaintiff makes on these statements is based on the statement made therein that "The Board of Directors recommends that . . . shares available for grant be replenished so that grants of options can con-

18. The 1975 proxy statement's non-disclosure of the nature of the May 22, 1974 amendments was made even more misleading by the statement "The Plan, which was first approved by the stockholders on April 10, 1975 and amended by stockholder action from time to time thereafter, provided prior to the proposed amendment that . . . (b) the total number of shares . . . subject at any one time to options, plus the number of shares of Common Stock then outstanding pursuant to exercises of options, may not exceed 2,921,090." This nearly impenetrable provision was inserted by the Board on May 22, 1974 in order that cancelled shares not be included in the calculation of the total available shares; i. e., it was the analogue of the proposal submitted to the shareholders, only it dealt with the calculation of the total number of shares available for use under the plan rather than the number of shares that could be granted to any one employee under the plan. Contrary to the implication of the 1975 proxy statement, this manner of calculating the total number of shares available for option purposes was never submitted to or approved by the shareholders after the announced limitation by directors of amendments to those approved by the stockholders.

Yet another defect in the disclosures made in the 1975 proxy statement was the failure to include the market price at or about the time the proxy statement was issued, as required by Item 11(a)(2) of Schedule 14A, 17 C.F.R. § 240.101.

tinue to be made." Plaintiff claims that the use of the word "replenished" was misleading, in view of the Board's belief that it was empowered to cancel outstanding options and issue new ones in their stead. According to plaintiff, the stockholders might not have approved an increase in shares available for option use if they had known that this alternative source was open to the corporation.

The short answer to this is that there was nothing misleading about the use of the word "replenish". The Board wanted fresh shares against which it could issue new options, and the language reflects that purpose. Nor was the Board required "to discuss the panoply of possible alternatives to the course of action it [was] proposing." *Umbriac v. Kaiser*, 467 F.Supp. 548 (D.Nev. 1979).

Plaintiff argues, however, that since the 1974 proxy statement was issued little more than a month before the Board authorized the Stock Option Committee to conduct a cancellation and exchange, the Board was required under the then applicable federal regulations to disclose the cancellation and exchange as a "presently proposed transaction" relating to the remuneration of corporate officers.[19]

This argument is based on nothing more than speculation as to how much preparatory work was done in anticipation of the May 22 Board Meeting. There is no evidence in the record to indicate that the cancellation and exchange was a "presently

proposed transaction" as of April 10, 1974, the date on which the proxy statement was issued. There was no duty to report that mere groundbreaking work was being done in this regard, if in fact it was, especially in the absence of any evidence indicating which if any of the defendant directors knew that such work was being done. *See, Nemo v. Allen*, 466 F.Supp. 192 (S.D.N.Y. 1979).

Plaintiff's other claims with respect to alleged omissions in the 1973 and 1974 proxy statements do not rise to the level of § 14(a) violations. Both statements contained adequate disclosure of the material features of the stock option plan and of the stock option activity of the directors of the corporation.[20]

Consequently, there having been no violation of § 14(a) in either the 1973 or 1974 proxy statements, the shareholder approved additions to the pool of stock available for stock option purposes were validly procured. The overgrant of options ultimately resulting from the cancellation is thus limited to 14,265 shares, plus any grants of options to individual employees in excess of the 70,000 share maximum.

*Plaintiff's other claims*

The representations in the 1961 and 1963 proxy statements disavowing the Board's power to conduct a cancellation and regrant of options without shareholder approval, under the plan then in effect, do not serve to augment the measure of the recovery indicated above.[21] Plaintiff's arguments

---

19. *See*, 17 C.F.R. § 240.14a–101, Schedule 14A, Item 7(f) (1978). The requirement that proxy statements describe "any presently proposed transactions" involving directors and officers has been deleted from the current regulations. *See*, 43 Fed.Reg. 34402, 34413 (Aug. 3, 1978).

20. Plaintiff's claim that the 1973 and 1974 proxy statements should have disclosed that the Board had the power to amend the plan without shareholder approval, as required by 17 C.F.R. § 240.14a–101, Schedule 14A, Item 9(e), might have some merit if the Board had in fact retained possession of such a power. In view of this Court's determination, however, that the Board had withdrawn its statutory power to act without stockholder ratification as of at least June 30, 1973, there is no basis for

requiring disclosure of such a power prior thereto.

21. Defendants have shown that it was the policy of the N.Y.S.E. to require companies to include the above-mentioned "undertaking" (*i. e.,* not to cancel and regrant options without shareholder approval) where the stock option plan in issue was "restricted", but not to require the undertaking where the plan in issue was "qualified". The reason for this policy is that qualified option plans contain built-in safeguards against the abuse of cancellations and regrants that are not present in restricted plans. Under a restricted or non-qualified type plan, a company can in effect reduce the price of options every time the market price drops simply by cancelling and regranting options;

concerning those representations do not go beyond the holding of the Court striking down the May 22, 1974 amendments and do not negate the fact that the Board nonetheless overran the authorized pool of otherwise available stock by only 14,265 shares.

*Conclusion*

Accordingly it is held that there was an overgrant in 1977 of options on 14,265 shares, which is set aside; and, the grant of options in excess of a total of 70,000 shares to any recipient is likewise set aside. The excesses are to be cancelled by Revlon and if there has been any exercise of such options the monies paid to Revlon on exercise thereof are to be refunded and the equivalent number of shares returned to Revlon.

In the event that any dispute arises as to application of these rulings that cannot be resolved by the parties, an appropriate application may be made to the Court for a hearing and entry of a further order at the foot of the judgment to be entered hereon.

The foregoing shall constitute the findings of fact and conclusions of law on the issue of liability. Fed.R.Civ.P. 52(a).

SO ORDERED.

under a qualified plan, a cancellation and regrant is not equivalent to a simple price reduction because the new options cannot be exercised prior to the expiration date of the cancelled options. (Technically, this is so because under a qualified plan, no option is exercisable while any option previously granted at a higher price is outstanding, and cancelled options are considered to be "outstanding" for these purposes.) *Since the policy of the N.Y.S.E. was only to require the above-mentioned "undertaking" with respect to non-qualified plans, and since at the time of the cancellation and exchange here in question Revlon's plan was a* qualified plan, plaintiff has not demonstrated that the cancellation and exchange violated any N.Y.S.E. policy or rule.

However, it should be noted that defendants reach too far in arguing that for these same reasons, Revlon was entitled after 1964 simply to disregard the representations it had made to its stockholders. The stockholders could not be expected to know that, so far as the N.Y. S.E. was concerned, the reasons for Revlon's having promised not to cancel or regrant options without shareholder approval had disappeared with the conversion of the plan in 1964 to a qualified plan.